DECISION
Plaintiff appeals the Clackamas County Board of Property Tax Appeals Real Property Order, filed March 8, 2010, determining the 2009-10 real market value of property identified as Account 05016770 (subject property). A trial was held in the Oregon Tax Court courtroom, Salem, Oregon, on October 13, 2010. Fred Dodd, Appraiser II, appeared on behalf of Plaintiff. Amy Fulmer appeared on behalf of Defendants. Bradley Alan Armbrust (Armbrust), IFA, testified on behalf of Defendants.
Plaintiff's Exhibits 1 through 12 and Defendants' Exhibits A through J were admitted without objection.
 I. STATEMENT OF FACTS
The subject property is a two-story, 3,618 square foot single family residence located in West Linn, Oregon.[1] (Def's Ex J-2.) The subject property was completed in December 2008. Defendants contracted in February 2008 with Renaissance Homes to build the subject property in its subdivision, Rosemont Pointe. (Def's Ex A-1.) Fulmer testified that Defendants agreed to the "published list price [$761,900, not including upgrades or lot premium charges] of a Windsor Euro" style home. (Id.) Fulmer testified that the home was completed in early December 2008, *Page 2 
and a statutory warranty deed transferring ownership to Defendants was recorded on December 5, 2008, stating "true consideration for this conveyance is $788,411." (Ptf's Ex 2.)
Relying on the consideration stated in the statutory warranty deed for the subject property and five comparable sales, Dodd concluded that the 2009-10 real market value of the subject property as of January 1, 2009, was $789,272. (Ptf's Ex 1, 2.) The "adjusted sale price RMV" of the five comparable properties ranged from $681,500 to $900,740. (Def's Ex 3.) Dodd made various adjustments, including sale date, quality/class, total living area square feet, basement, garage, baths and fireplace, to the properties he identified as comparable. (Id.)
Dodd testified that the dollar amount of the adjustments excluding "sale date and quality/class," came from the "Department of Revenue Cost Factor Book." He testified that the "square foot living adjustment is based on the contribution each portion of the house contributes" to the whole. For example, Dodd testified that he relied on "his experience" in concluding that the main floor square foot adjustment should be $70 per square foot, that the basement which "is the least to construct" should be $50 per square foot and that the garage should be "$40 per square." Dodd testified that because the real estate market was declining "both before and after the appraisal date of January 1, 2009, * * * the sales of comparable homes were time adjusted 15% per year, or 1.25% per month for the purpose of this report." (Ptf's Ex 1.)
In response to Fulmer's question about the "sale date" percent stated for comparable sales 2, 3 and 4, Dodd testified that the percentage amount was incorrectly stated but he used the correct percent per month to adjust the sale price. Armbrust's appraisal report stated that Renaissance Homes reduced its "base prices for home in the subject development" for the subject property approximately 12 percent between October 2007 and December 2008. (Defs' Ex J-6.) In response to Fulmer's question why he made a "quality" adjustment for comparable *Page 3 
sales 3 and 5 when both properties are "identical" to the subject property, Dodd testified that the "quality/class" of the properties was set prior to the improvement being completed and he could not remember if he did an interior inspection after the improvement was complete. He defined "quality/class" as a "neighborhood sharing the same real estate market characteristics." Dodd testified that he did an interior inspection of the subject property. Fulmer testified that comparable sale 3 was "pre-built by the developer" and sold in May 2008 for $725,000, and comparable sale 5 was also a "pre-built" and sold in November 2008 for $734,000. (Def's Ex A-2.) Fulmer testified that comparable sale #5 was "advertised" for $899,900. (Def's Ex G-1.)
Armbrust testified that in preparing his appraisal report he reviewed "the entire market" and did not stay within the subject property's subdivision. He testified that he used two approaches, cost — "new, less depreciation plus the site improvements" — and the comparable sales approach, to determine a real market value as of January 1, 2009, of $723,000. (Defs' Ex J-1.) Armbrust determined an indicated value by cost approach of $725,800. (Defs' Ex J-3.) Placing the "greatest weight" on two comparable properties, comparable sales 1 and 2, "located within the subject development" after comparing to two comparable properties, comparable sales 3 and 4, "located outside the development," Armbrust determined an indicated value by sales comparison approach" of $722,000. (Defs' Ex J-3 to J-7.)
Armbrust testified that he did not rely on "presale homes to arrive at the market value because" those homes "were not exposed to the market" and the "developer controlled the development." He explained that he "used" the sale of comparable properties outside the development to "prove that the developer is not manipulating the market." Armbrust testified that he used "$80 per square foot" to adjust living area square feet and his "time adjustment" was "1.5 per month from "contract date, not closing date" to "effective date of appraisal." *Page 4 
Fulmer requested that the court agree with the Board of Property Tax Appeals and determine that the real market value of the subject property as of January 1, 2009, was $709,569.
 II. ANALYSIS
The issue before the court is the 2009-10 real market value of Plaintiffs' property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. SeeRichardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing Gangle v. Dept. of Rev.,13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[2]
A. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2); OAR 150-308.205-(A)(2).[3] Because the subject property is the primary residence of Defendants, the income approach is not applicable.
In a case such as the one before the court, the comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." Chambers Management Corp andMcKenzie River Motors v. Lane County Assessor, TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, TheAppraisal of Real Estate 335 (12th ed 2001).
Dodd's determination of the subject property's real market value as of January 1, 2009, was supported by the stated consideration of the subject property's statutory warranty deed and a *Page 5 
comparable sales approach. Dodd's reliance on the stated consideration of the subject property's statutory warranty deed is contrary to the statutory definition of real market value. See ORS 308.205(1). The stated consideration was a negotiated contract between Defendants and the subdivision developer as of February 2008; a negotiated contract dated months prior to the assessment date is not necessarily an arm's-length transaction between a willing buyer and willing seller as of the January 1, 2009, assessment date. Adjusting the consideration ($788,411) for the time adjustment of 15 percent per year, or 1.25 percent per month, the real market value of the subject property as of the assessment date would be $709,569 — the real market value determined by the Board of Property Tax Appeals.
B. Real Market Value — Comparable Sales
After considering both appraisers' comparable sale approach, the court concludes that the greatest weight should be given to the sale of identical properties located in the same neighborhood subdivision. Looking at Dodd's comparable sales approach, comparable 3 and 5 were, according to Fulmer, the same Windsor Euro model as the subject property. Dodd's adjusted sale price of comparable 3 was $681,500 and the adjusted sale price of comparable 5 was $752,260 after a quality/class adjustment. (Ptf's Ex 3.) The validity of that adjustment was challenged by Fulmer and Dodd could not remember if he completed an interior inspection of those properties to verify that the quality/class determined as of the time of construction was the same after construction was complete. The amount of Dodd's qualify/class adjustment was $50,000 to comparable 3 and $30,000 to comparable 5. (Id.) Armbrust used Dodd's comparable 5 as one of two comparable properties that he gave the most weight in his comparable sales approach. (Defs' Ex J-3.) Armbrust made no adjustment for quality/class and determined an adjusted sale price of $720,400. (Id.) The sale date of Dodd's comparable 5 was the closest to *Page 6 
the assessment date. The indicated range of real market value is between $681,500 and $752,260 with Dodd's quality/class adjustment unsubstantiated.
In addition to the comparable sales approach, Defendants' appraiser considered the cost approach. Armbrust's determined indicated value by the cost approach was $725,800. (Defs' Ex J-3.) That value is within the indicated range of value determined by the comparable sales approach of both appraisers. (Id.)
The statutory definition of real market value looks to market transactions at or close to the assessment date to determine value. The comparable sales approach is the best measure of the market for residential property. The indicated value by the comparable sales approach determined by Defendants' appraiser is supported by a second approach, the cost approach, which is particularly applicable for new properties like the subject property. The court concludes that Defendants' appraiser's determination of value is the best indication of market value as of the assessment date.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that the real market value of the subject property must be determined by the market. Now, therefore,
IT IS THE DECISION OF THIS COURT that the 2009-10 real market value of the subject property identified as Account 05016770 is $723,000.
Dated this ____ day of February 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR. *Page 7 
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron February 16, 2011, and filed and entered the same day.
[1] Plaintiff described the subject property as 3,601 square feet. (Ptf's Ex 1.)
[2] References to the Oregon Revised Statutes are to year 2007.
[3] References to the Oregon Administrative Rules (OAR) are to year 2007.